**KRISS & FEUERSTEIN LLP**
Jerold C. Feuerstein, Esq.
Jason S. Leibowitz, Esq.
Lexington Avenue, Suite 1200
New York, New York 10017
(212) 661-2900
(212) 661-9397 – facsimile
jfeuerstein@kandfllp.com
jleibowitz@kandfllp.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 17-11224-mkv |
| David Ebrahimzadeh, | |
| | Hon. Mary Kay Vyskocil |
| Debtor. | United States Bankruptcy Judge |

------------------------------------------------------------x

## KNIGHTHEAD SSRE REIT, INC.'S OBJECTION
## TO THE DEBTOR'S REQUEST FOR LOSS MITIGATION

Knighthead SSRE REIT, Inc. (the "Secured Creditor"), a secured mortgagee and first lien

holder of that certain real property located at 170 East 77th Street Apartments 7A/8A New York,

NY 10075 (Block 1411; Lot 1130) (the "Property") respectfully submits the instant Objection (the

"Objection") to David Ebrahimzadeh's (the "Debtor") request to enter into loss mitigation, and

respectfully states as follows:

### PRELMINARY STATEMENT

1.     The Debtor's status of an occupant of the Property, wherein he holds neither a

leasehold nor an ownership interest in the Property, and his complete lack of privity with the

Secured Creditor should serve as the primary basis to deny his request to enter into loss mitigation

with the Secured Creditor.

2.     As set forth in the Loss Mitigation Program Procedures ("Loss Mitigation")

promulgated by the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court"), Loss Mitigation is intended to describe a range of solutions that may avert

the loss of **a debtor's property** to foreclosure, increased costs to the lender, or both.

3.  Since the Debtor does not own the Property, it is clear that while the Debtor would like to continue utilize Loss Mitigation in order to continue to receive the benefits of the automatic stay and reside at the Property (without making any payments), no arrangement between the Debtor, as a mere occupant at the Property, and the Secured Creditor as mortgagee, could remedy the status of underlying loan (the "Loan"), the underlying foreclosure action with Diamond Condo (the "Borrower") or the Property because the Debtor does not have the ability to bind Diamond Condo (the "Borrower") with respect to the Loan or the Property.

4.  As a result, the Debtor's mere naked possessory interest in the Property (and his inability to negotiate any meaningful settlement with the Secured Creditor on account of the underlying Loan encumbering the Property or the Property itself), should be determined to exceed the scope of what Loss Mitigation was intended to accomplish, and further serve to preclude the Secured Creditor from having to participate in Loss Mitigation with the Debtor as occupant.

5.  Accordingly, the Secured Creditor respectfully requests that this Court deny the Debtor's request for loss mitigation with the Secured Creditor.

## BACKGROUND

### The Loan, Note, Mortgage & Guarantee

6.  On or about July 18, 2014, the Knighthead made a loan to the Borrower, the owner of the Property, in the original principal sum of Four Million Three Hundred, Sixty-Five Thousand and 00/100 Dollars ($4,365,000.00) (the "Loan"). The Loan was evidenced by a *Secured Promissory Note* (the "Note") dated July 18, 2014, which was executed by the Borrower, through its sole member Felice DiSanza ("DiSanza"). A copy of the Note is annexed hereto as **Exhibit "A"**.

7.  To secure repayment of the indebtedness evidenced by the Note, on or about July 18, 2014, the Borrower further executed and delivered to the Knighthead, a *Mortgage, Assignment*

2

*of Leases and Rents and Security Agreement* (the "Mortgage"), which encumbered the Property in

the principal sum of Four Million Three Hundred, Sixty-Five Thousand and 00/100 Dollars

($4,365,000.00).  A copy of the duly executed Mortgage, which was recorded with the Office of

the City Register of the City of New York, County of New York (the "City Register") on August

5, 2014 under CRFN: 2014000257878 is annexed hereto as **Exhibit "B"**.

8.      To further secure repayment of the indebtedness evidenced by the Note, DiSanza

duly executed and delivered that certain Guarantee dated as of July 18, 2014 ("Guarantee") in

favor of Borrower.

**Terms and Conditions of the Loan Documents**

9.      Section 2 of the Note captioned *Payments* provides as follows:

Maker shall pay to Holder (a) on the date hereof (the "Funding Date"), all interest
due under this Note for the period commencing on Funding Date through and
including July 31, 2014, and (b) commencing on September 1, 2014, and on the
first (1st day of each and every month thereafter through and including **August l,
2015** (such date, or such earlier date on which Holder accelerates payment of the
indebtedness evidenced hereby pursuant to the provisions hereof or of any of Loan
Documents, being herein referred to as the "Maturity Date"). (emphasis added)

10.      In addition, Section 11(c) of the Mortgage captioned *Transfer or Encumbrance of*

*the Mortgaged Property* expressly provide as follows:

Mortgagee shall not be required to demonstrate any actual impairment of its
security or any increased risk of default hereunder in order to declare the Debt
immediately due and payable **upon Mortgagor's sale, conveyance, alienation,
mortgage, encumbrance, pledge or transfer of the Mortgaged Property or any
portion thereof without Mortgagee's consent.** This provision shall apply to every
sale, conveyance, alienation mortgage, encumbrance, pledge or transfer of the
Mortgaged Property regardless of whether voluntary or not, or whether or not
Mortgagee has consented to any previous sale, conveyance, alienation, **mortgage,
encumbrance, pledge or transfer of the Mortgaged Property.** (emphasis added)

**Borrower's Defaults Under the Loan**

11.      On or about August 20, 2014, the Borrower defaulted under and violated the terms

of the Mortgage (the "First Default") at Section 11(c), by giving a subordinate mortgage (the

3

"Second Mortgage") which further encumbered the Property to Samuel Shpelfogel ("Shpelfogel")
in the original principal sum of $500,000.00, which Second Mortgage was dated August 20, 2014
and recorded with the City Register on August 28, 2014 as CRFN: 2014000286674.

12.    On or about September 18, 2014, the Borrower again defaulted under and violated
the terms of the Mortgage (the "Second Default") at Section 11(c), by giving another subordinate
mortgage (the "Third Mortgage") which further encumbered the Property to First Premier Capital
LLC ("First Premier") in the original principal sum of $740,000.00, dated September 18, 2014 and
recorded in the City Register October 1, 2014 as CRFN: 2014000324217.

**The Forbearance Agreement**

13.    After the First Default and the Second Default, the Borrower requested that
Knighthead forbear from foreclosing on the Property and otherwise exercising upon its and
remedies under the terms of the Loan Documents through and including December 17, 2014.

14.    As a result, on or about November 7, 2014, the Borrower and the Secured Creditor
entered into that certain *Forbearance Agreement* (the "Forbearance Agreement" and together with
the Note and Mortgage, the "Loan Documents") to address how the parties would treat the First
Default and the Second Default.

15.    Through the Forbearance Agreement, the Borrower, *inter alia,* acknowledged the
First Default and the Second Default under the Mortgage, and requested that the Knighthead
forbear from foreclosing on the Property through and including December 17, 2014, while the
Borrower sought refinancing in an amount necessary to satisfy the Knighthead.

16.    Notwithstanding, the Borrower defaulted under the Forbearance Agreement by
failing to satisfy the Loan and payoff Knighthead by or before December 17, 2014 (the "Third
Default").

4

**The Foreclosure Action**

17.     As a result of the Third Default and the Borrower's failure to cure same, on or about January 22, 2015, the Secured Creditor commenced an action to foreclose the Mortgage before the Supreme Court for the State of New York, County of New York (the "Foreclosure Action").

18.     In connection with the Foreclosure Action, on or about January 6, 2016 the State Court entered a Judgment of Foreclosure and Sale ("JFS") which was filed in the Office of the New York County Clerk on February 4, 2016.  A copy of the JFS, which was served with Notice of Entry on the Borrower on or about February 5, 2016 is annexed hereto as **Exhibit "C"**.  Indeed, the Debtor was not named in the Foreclosure Action or the JFS and his existence was not make known to the Secured Creditor.

19.     Thereafter, and in accordance with the JFS, the Secured Creditor noticed a sale of the Property (the "First NOS") on March 16, 2016 at 2:00 p.m.

**The History of Bad Faith Bankruptcy Filings**

20.     On the same day as the Secured Creditor's scheduled foreclosure sale of the Property on March 16, 2016, the Borrower commenced a voluntary case under Chapter 11 ("Borrower Chapter 11") of Title 11 of the United States Code (the "Bankruptcy Code").

21.     On May 4, 2016, the Secured Creditor moved this Court for Relief from the Automatic Stay in the Borrower Chapter 11 pursuant to 11 U.S.C. §§ 362(d)(1) and 362(d)(2) (the "Motion for Relief") [ECF No. 15], which Motion for Relief was made returnable before this Court on June 1, 2016.

22.      At a hearing on the Motion for Relief held on June 1, 2016, the Debtor and the Borrower appeared, and agreed to a resolution of the Motion for Relief, which ultimately resulted in the entry of an Order entered on November 10, 2016 [ECF No. 39] (the "November Order"), through which the Borrower waived all claims and defenses to the Motion for Relief, the Secured

Creditor's secured claim and the underlying Loan, and as consideration therefore, the Secured Creditor agreed to, *inter alia*, refrain from conducting a foreclosure sale of the Property until November 30, 2016 (the "Extended Deadline"), in the event that the Secured Creditor did not receive payment in full by the Extended Deadline.

23.     The Secured Creditor did not receive payment in full by the Extended Deadline and as a result, this Court entered an Order on December 7, 2016 granting relief from the automatic stay in favor of the Secured Creditor (the "Relief Order").

24.      In connection with the Relief Order and the JFS, the Secured Creditor noticed a sale of the Property (the "Second NOS") on January 18, 2017 at 2:00 p.m..

25.     By *Order Denying Ex-Parte Motion to Limit Notice Required for Motion to Dismiss Case and Stay of Foreclosure Sale* dated January 18, 2017 [ECF No. 55] (the "January Order"), this Court denied the Borrower's motion to dismiss this case and stay the Secured Creditor's ability to conduct a foreclosure sale of the Property.

26.     As a result of this Court's entry of the January Order, on January 18, 2017, DiSanza filed petition for Chapter 11 relief before the United States Bankruptcy Court for the District of New Jersey (the "NJ Court**")** in his individual capacity, in the matter styled *In re Felice Di Sanza* under Case No. 17-10984-rg (the "NJ Case").

27.      On February 15, 2017, the NJ Court entered an Order granting relief from the automatic stay (the "NJ Stay Order") in favor of the Secured Creditor, upon which the Secured Creditor scheduled a foreclosure sale for May 3, 2017 (the "Foreclosure Sale").

28.     Accordingly, the Secured Creditor again noticed a sale of the Property for May 3, 2017. (the "Third NOS").

29.     On May 1, 2017, the Debtor and Borrower emailed their latest Order to Show Cause ("OSC") for the Court, for the purpose of forcing this Court to bypass all procedure and So Order

6

a Stipulation ("Stipulation") which was executed by and among the Debtor, the Borrower, and the

Secured Creditor, through which, the Secured Creditor would have been granted prospective relief

from the automatic stay, and the Borrower would have received an adjournment of the impending

foreclosure sale, pending a dismissal of the Borrower's Chapter 11 case.  A copy of the Stipulation

is annexed hereto as **Exhibit "D"**.

30.     Indeed, the Stipulation as signed by the Borrower and the Debtor, provides, among

other things, that the Borrower and Debtor "acknowledge and agree that (a) no lease exists between

the Occupant on the one hand, and the Debtor, DiSanza or any other party on the other hand with

respect to the Property …"  Stipulation, ¶ 13.

31.     On the morning of May 3, 2017, this Court denied the OSC.

32.     On the afternoon of May 3, 2017, they filed another OSC before State Court,

alleging personal service on DiSanza was not valid.  Notwithstanding, State Court declined to

grant injunctive relief.

33.     Minutes before the Foreclosure Sale on May 3, 2017, the Debtor filed his instant

petition for Chapter 11 bankruptcy relief, in order to thwart the Secured Creditor's ability to sell

the Property.

34.     On January 22, 2015, the Secured Creditor commenced an action against

defendants Diamond Condo LLC ("Borrower"), the owner of the Property, and Felice DiSanza, as

guarantor, in the Supreme Court of the State of New York, County of New York, to foreclose the

Mortgage on the Property under Index No. 850018/2015 (the "Foreclosure Action").  As evidenced

by the deed to the Property annexed hereto as **Exhibit "E"**, the Property is not owned by the

Debtor, but rather, is owned by the Borrower, who is also a Chapter 11 Debtor in a separate

pending bankruptcy case before this Court (Case No. 16-10619).

35.     Since the Debtor's entire legal connection with the Property stems from his status

as an occupant, it is clear that the Debtor's bare possessory interest cannot withstand the Secured

Creditor's application for relief from the automatic stay, nor should the Debtor be entitled to

engage the Secured Creditor in loss mitigation.

## **DISCUSSION**

36.     The Loss Mitigation Program Procedures (the "Procedures") expressly provides in

pertinent part, at Section I, captioned Purpose, as follows:

> The Loss Mitigation Program is designed to function as a forum for debtors and
> lenders to reach consensual resolution whenever *a debtor's residential property is
> at risk of foreclosure*. The Loss Mitigation Program aims to facilitate resolution by
> opening the lines of communication between the debtors' and lenders' decision-
> makers.

37.     It cannot be denied that the Property is not the Debtor's residential property because

the Property is owned by the Borrower, and not the Debtor.  Thus, the Debtor's attempt to engage

the Secured Creditor in Loss Mitigation exceeds the scope of what Loss Mitigation was intended

to accomplish, and the Debtor's request should be denied.

38.     Similarly, Section II of the Procedures captioned Loss Mitigation Defined, provides

in pertinent part as follow:

> The term "Loss Mitigation" is intended to describe the full range of solutions that may
> avert either the loss of *a debtor's property* to foreclosure, increased costs to the lender, or
> both. Loss mitigation commonly consists of the following general types of agreements, or
> a combination of them: *loan modification, loan refinance, forbearance, short sale, or
> surrender of the property in full satisfaction*. The terms of a Loss Mitigation solution will
> vary in each case according to the particular needs and goals of the parties.

39.     Since the Property is not the Debtor's property, the Debtor's entire legal connection

with the Property stems from his naked possessory interest, and the Debtor lacks the capacity to

enter into a loan modification, loan refinance, forbearance, short sale or surrender of the Property

in full satisfaction of the indebtedness with the Secured Creditor, the Debtor's request to engage

the Secured Creditor in Loss Mitigation should be denied.

40.     Accordingly, and for the reasons set forth more fully below, the Secured Creditor

respectfully requests that this Court enter an Order, denying the Debtor's request to engage the

Secured Creditor in Loss Mitigation, and for such other and further relief as the Court deems just

and proper.


Dated:  New York, New York
        June 5, 2017

                                    KRISS & FEUERSTEIN LLP
                                    *Attorneys for Knighthead SSRE REIT, Inc*

                        By:     *s/ Jason S. Leibowitz*
                                Jason S. Leibowitz, Esq.
                                360 Lexington Avenue, Suite 1200
                                New York, New York 10017
                                (212) 661-2900 – telephone
                                (646) 454-4168 - facsimile